OPINION
This case is on appeal from the April 15, 1998 judgment sentencing appellant, Robert Hamman, following his jury conviction on two counts of burglary, R.C. 2911.12(A)(1), one count of receiving stolen property, R.C. 2913.51(A), and one count of grand theft auto, R.C. 2913.02(A)(1) and (2). On appeal, appellant asserts the following assignments of error:
 "I. THE EVIDENCE IS NOT LEGALLY SUFFICIENT TO SUSTAIN THE DEFENDANT'S CONVICTIONS
 "II. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN GIVING A COMPLICITY JURY INSTRUCTION ON THE CARRICK BURGLARY CHARGE
 "III. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE"
At trial, the following evidence was presented. Gregory Lacy, the owner of a 1987 Oldsmobile, Delta 88, worth approximately $2,500, testified that he was away from home on June 27, 1997, and that he did not give anyone permission to drive his car while he was away. His wife, Hester Lacy, testified that her husband's car was stolen on the evening of June 27, 1997. She believed that John Lugo, her nephew, had stolen the car. Lugo, his girlfriend, Leslie Blank, and his friend, appellant, had been visiting Lacy's mother on the porch of the home the two families share. That evening Lugo asked to borrow the Lacys' car, but Hester Lacy refused in the presence of Blank and appellant. No one was allowed to drive the car because there was no insurance coverage for the car. However, Hester Lacy admitted that she had permitted her sister or mother to drive the car at times without Lacy's husband's knowledge because she did not have a driver's license. Lacy's testimony was also attacked on cross-examination by her written statement to the police three days after the crime occurred. In her statement, she never indicated that she had told Lugo that he could not use the car. She only indicated that he did not have permission to use her car.
Lacy further testified that later that evening, when she was in her living area of the dwelling, Lugo and Blank came to visit her for a short time. When they came in, Lugo used the bathroom and Blank stood by the door awhile before sitting down in the living room. Lugo joined them in the living room a few minutes, and then they both left. A few minutes later, around 10:30 p.m., Hester Lacy looked for her keys, which she had left on a table near the door, and found them missing. Then she discovered that her car was gone. Lugo, Blank, and appellant were gone as well.
Lacy immediately called Blank and found that she was at home, which was about four or five miles away. Lacy then called the police. She denied waiting to call the police until 11:45 p.m. in hopes that Lugo would return the car. Lacy also testified that she feared telling her husband about the car being stolen because she knew that he would be upset.
Blank called Lacy the next day indicating that she was afraid she would get into trouble over using the car. While she admitted that she had gotten a ride home from Lugo the prior evening, she denied knowing the whereabouts of Lugo and appellant.
The car was recovered the next morning. Mr. Lacy testified that the car had been substantially damaged and that he has no insurance coverage to pay for the damages.
Edward Tackett, a Willard police officer, testified that he dispatched to the Lacy residence about a stolen vehicle at 11:44 p.m. that evening. He was unable to find the vehicle that night, but received information the next day that it had been recovered by another agency. When Lacy gave her statement to Tackett, she never mentioned appellant's name as one of the people she suspected had stolen her car. Furthermore, Lacy never told him that she had told Lugo that he could not use the car, she merely stated that no one had permission to use the car.
Leslie Blank testified that she and Lugo were dropped off at Lacy's home that evening by a friend. Appellant arrived about forty-five minutes later by bicycle. Blank overheard Lugo and appellant talking about getting a ride to somewhere and calling people about a ride. She wanted to go home because she had to work the next day. She remained at the home for a couple of hours. At one point, Lugo went upstairs and she followed. She and Lugo talked to Hester Lacy. Then the two of them went back to the porch. At that time, Lugo indicated that they would leave to walk to a friend's house. Lugo, appellant, and Blank left and walked down the block and then around to the alley behind the grandmother's house. Lugo told Blank that Lacy said that he could use her car so long as the grandmother did not know about it. Before they got into the car, she saw a jar of coins by a tree. Appellant picked up the jar and put it into the car. Lugo then drove Blank directly home around 10:30 p.m. Around 11:30 p.m., Blank received a telephone call from Lacy who wanted to know where Lugo was and accusing him of stealing her car.
Blank further testified that she call Lacy the next day in the afternoon. Afterward, she met Lugo and appellant who had come to the Comfort Inn where Blank worked in order to swim. At that time Lugo tried to get her to go somewhere with them, and she confronted them about the car being stolen. Neither of them reacted to her accusations. Lugo indicated that Lacy had just been upset because she thought that they had gotten in an accident or something. So, Blank called Lacy again but did not indicate that Lugo and appellant were there. A few days later, after talking to Lacy again, Blank went to the police to make a statement about what she knew about the matter. When Lugo and appellant came to visit her at her home, she called the police.
Stanton Garheart testified that he lives in Plymouth, Ohio, and is Lugo's friend. About 6:00 or 7:00 p.m. on June 28, 1997, he received a telephone call from Lugo who indicated that he and appellant were stranded on Peru-Center Road because their car had broken down. Garheart agreed to pick them up. When he arrived at the area, he saw a car parked along the road, but could not see anybody. After he turned around and was headed back toward the car, he saw two people walking away from the car. Lugo was carrying a cigar box filled with coins. He later saw that the box was about half full of loose silver coins. They stopped at a drive-through carry out and purchased some alcohol with the coins. They drove first to an apartment complex because Lugo wanted to see if a friend was home, but he was not home. They then went to Holiday Lakes and stopped at Lugo's old girlfriend's house. Garheart honked the horn to see if anyone was home; but, no one was home. They drove back to Willard, Ohio, and then on to New Haven, Ohio, where Garheart left Lugo and appellant.
Frederick Meyer testified that he resides in Holiday Lakes in Willard, Ohio. While he was on vacation for several weeks in June and July in the summer of 1997, someone stole some of his weapons he kept in his home. Meyer knew Leslie Blank because she was his next door neighbor.
Merlin Scheid testified that on June 28, 1997, around 4:00 p.m., Lugo and appellant came to his home on Peru-Center Road, Monroeville, Ohio, asking to use the telephone. Both men were dressed in shorts and T-shirts. Lugo made a long distance call to someone in Willard, Ohio. When appellant came in he was carrying an undershirt rolled up concealing what Scheid thought was no larger than a small revolver. Appellant laid the package by the back door and then they sat down for a few minutes. The two left, forgetting the package; but, appellant quickly came back to get the undershirt.
Clemens Smith testified that he lives next door to Scheid on Peru-Center Road. He testified that on June 28, 1997, he was away from home twice that day for short periods of time. As Smith was leaving his home that day, he saw a car stopped along the road and two men walking around. The next morning, he found a shotgun shell laying on the floor. He remembered that he kept in his closet a shotgun shell in a cigar box filled with quarters, some rolled and some loose. He looked for the box but found that it was missing. Also stolen were a tobacco can filled with pennies and another can full of nickels and dimes. What appeared to be one of the cans was found in a nearby ditch.
Gregory Gadberry, a patrol officer for the Huron County Sheriff's Office, testified that he investigated the burglary at the Smith house. Gadberry did not take fingerprints from the door because Smith had already touched the area and Gadberry could not see any prints on the door. He later retrieved a can from a nearby ditch, which Smith believed was the can that held the coins in his closet.
Rachael Smith, who lives in North Fairfield, Ohio, testified that on June 30, 1998, she and her sons left their home around 11:30 a.m. and returned around 1:30-2:00 p.m. When she arrived home, Smith found the garage door was up and the inside door to the house was open. She was sure that when she left the door was closed and the lights were off. The door is not normally locked and the back door to the garage was not locked. Inside, she noticed a footprint on the kitchen floor, which she had mopped before leaving the home that morning. She discovered that her video camera was missing, her husband's guns, and a small cash box which contained about $20 of collector's coins. Later she discovered that the front doorknob was broken and that the door could not be opened. Tim Smith, Rachel Smith's husband, identified two of the guns recovered by the police as being his.
Michelle Carrick, who lives in Willard, Ohio, testified that on July 1, 1997, she and her family went to bed around 10:30 p.m. She was awakened about an hour later and saw a figure of a person looking into the bedrooms. The person appeared four-to-six inches taller than her, had a pot belly, and was wearing jean shorts and a light-colored shirt. She got up and followed the person. When she got downstairs, she found the front door open. She then discovered that her purse was missing from the kitchen table. The next day, her husband found a barbed wire fence marking the property line laying on the ground. Caught on the fence was a piece of jean material. She also found one of several pouches she kept in her purse near the fence. Her purse was found in a field west of her home. Although they had attempted to lock their doors that evening, the front door may not have been locked because it sometimes did not close properly. There were no signs of forced entry.
Robert McLaughlin, a detective for the Huron County Sheriff's Department testified that he investigated several burglaries in the southern part of the county in June 1997. He picked up Lugo and appellant, who were walking, on Lakeshore Drive, Holiday Lakes, Willard, Ohio, on July 2, 1997 near Blank's home. Appellant was wearing tennis shoes, blue jean shorts, and carrying a shirt. He also had small cuts on his wrists and on his thigh. Appellant claimed that he had been fishing. Appellant's shorts were submitted to the Ohio Bureau of Criminal Identification because they had blood on them, along with the piece of blue-jean material found on the barbed wire fence.
When he was picked up, appellant told McLaughlin that he was with Kelly Steele, his live-in girlfriend, at midnight on July 1. However, Steele testified that appellant was not at home that evening. She further testified that she received a telephone call from him sometime during the night asking that she come and get him. They argued and then she hung up on him. She did not pick him up.
McLaughlin also testified that he recovered Meyer's and Smith's guns from Chris Adams among other stolen items. Adams initially told McLaughlin he had given appellant two checks to cover the purchase of the guns. Appellant stated that Lugo had given him the guns and he gave them to Adams who then gave appellant a check for "wages." The prosecutor's officer agreed not to prosecute Adams if he cooperated in the investigation and testified at this trial. McLaughlin further testified that after Lugo and appellant were arrested, the number of burglaries in the area dropped dramatically.
Christopher Adams testified that he owns a small construction company and that appellant's brother works for him. Occasionally, appellant worked for him as well. During the week prior to June 30, 1997, around June 23 or 24, appellant brought Adams two guns and asked him to hold on to them for awhile. However, he never returned for them. On June 30, appellant and Lugo came to see him and he purchased two guns from appellant. He gave appellant a check for $400. On June 27, Adams had given appellant a check for $200 for work he had done for Adams, although he dated the check for June 28. On June 28, Adams gave appellant a $100 check as a loan. When Adams purchased the guns, he forgave the loan as part of the deal. Lugo did not want to take a check, but Adams refused to pay cash for them.
On June 30, appellant was working for Adams and was suppose to drive a dump truck to a worksite and met the rest of the crew. Appellant left before 8:00 a.m. He left his car at Adams' home. When Adams returned in the afternoon, he saw the dump truck was back and appellant's car was gone. A few days later when he moved the truck, he noticed that the muffler had been torn off. Appellant did not do any work that day.
Adams gave three different accounts of the dates he was on vacation in June and July 1997. However, on cross-examination, after reviewing his airline ticket stubs, he testified that he left on June 10. But, he also testified that he did not learn until after he came home from his trip that the sheriff's department had searched his house and seized the two guns he had purchased from appellant. He then called the sheriff's department to inform them that appellant had also given Adams two other guns.
Ted Manasian, a forensic scientist at the Ohio Bureau of Criminal Identification, testified that he analyzed the blue jeans and scrap of blue jean material. He concluded to a reasonable degree of scientific certainty that the scrap of material found on the barbed wire came from these shorts. However, Larry Dehus, a forensic scientist, testified on behalf of the defense that while the scrap of jean material has the same class characteristics as the jean shorts, the individual characteristics of the scrap are such that it cannot be conclusively stated that the scrap came from the shorts.
In his first assignment of error, appellant argues that the evidence was insufficient to sustain his convictions. A challenge to the legal sufficiency of the evidence questions whether the case should have been submitted to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict. State v. Smith (1997), 80 Ohio St.3d 89, 113, certiorari denied (1998), 140 L.Ed.2d 949, 118 S.Ct. 1811, 66 U.S.L.W. 3748. Therefore, a reviewing court may not reverse a conviction on this ground unless it finds that a rational factfinder, viewing the evidence in a light most favorable to the prosecution, would not have found that all of the essential elements of the crime had been proven beyond a reasonable doubt.Jackson v. Virginia (1979), 443 U.S. 307, 319, and State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus. See, also, State v. Thompkins (1997), 78 Ohio St.3d 380.
First, appellant argues that there was insufficient evidence to prove that he aided and abetted Lugo's theft of Lacy's car. Appellant contends that he cannot be found guilty of grand theft auto simply because he knowingly rode in a stolen car. Appellee argues that the fact that appellant knowingly rode in the stolen car for two days was sufficient evidence to support his conviction on the charge of grand theft auto.
Under R.C. 2923.03(A)(2), an accomplice may be "prosecuted as the principal offender * * * if he aids or abets another in committing the offense while acting with the kind of culpability required for commission of the offense." State v.Coleman (1988), 37 Ohio St.3d 286, paragraph two of the syllabus, certiorari denied (1988), 488 U.S. 900. The Ohio Supreme Court has defined an accomplice as follows:
 "* * * [O]ne who is guilty of complicity in crime charged, either by being present and aiding or abetting in it, or having advised and encouraged it, though absent from place when it was committed, though mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, no matter how reprehensible it may be, to constitute one an accomplice. One is liable as an accomplice to the crime of another if he gave assistance or encouragement or failed to perform a legal duty to prevent it with the intent thereby to promote or facilitate commission of the crime. * * *" (Emphasis added.) Black's Law Dictionary (5 Ed. 1979) 16. State v. Wickline (1990), 50 Ohio St.3d 114, 117-118, certiorari denied (1990), 498 U.S. 908.
Thus, the prosecution must prove that appellant took some affirmative action that assisted the principal offender. The state's proof may be by either direct or circumstantial evidence.State v. Cartellone (1981), 3 Ohio App.3d 145, 150. However, appellant's mere presence at the scene is insufficient to establish the crime of complicity. State v. Mootispaw (1996),110 Ohio App.3d 566, 570. Cf. State v. Pruett (1971), 28 Ohio App.2d 29,34, and State v. Davis (Apr. 24, 1998), Lake App. No. 96-L-167, unreported (which both hold that participation in a criminal act "may be inferred from presence, companionship and conduct before and after the offense is committed.").
The elements of the crime of grand theft auto are knowingly obtaining or exerting control over another's property, with the purpose of depriving that person of his property, without that person's consent. R.C. 2913.02
Appellant relies heavily on the case of State v. Sims
(1983), 10 Ohio App.3d 56. In that case, the defendant was charged with receiving stolen property (a motor vehicle) based upon the facts that he was found sitting in the rear seat of a stolen vehicle for a few minutes. The court held that the defendant as a mere passenger in a stolen vehicle could not be convicted of receiving stolen property when there was no evidence that he assisted or encouraged the driver's theft or retention of the vehicle or that he had a legal duty to object to such action. Evidence of having associated with the driver for thirty seconds was insufficient.
We find that the Sims case is distinguishable on its facts. In that case, there was no evidence that the passenger was involved in the theft of the car nor evidence that he had any time after he was in the vehicle to encourage the driver's use of the vehicle. However, in the case before us, there is direct evidence, if believed, that appellant knew that the car was stolen and yet continued to associate with Lugo. Appellant's continued association with Lugo can be viewed as an active encouragement to retain the stolen vehicle for their joint purposes. Cf. In theMatter of Smith (Sept. 29, 1989), Clermont App. No. 89-03-012, unreported (the defendant's actions to conceal the stolen property is proof that he was a "party" to the crime).
Next, appellant argues that there was insufficient evidence to link him with the theft of Smith's coins or Carrick's purse. We disagree. There was evidence presented from which the factfinder could conclude that appellant and Lugo were in the area of Smith's home on June 28, 1997, that they saw Smith leave his residence, and that they were seen later in the day together with the cigar box full of coins similar in description to that missing from the Smith home. The fact that appellant was not seen carrying the box does not make appellant any less guilty.
Furthermore, there was evidence presented from which the factfinder could conclude that appellant stole Carrick's purse. There was evidence that the scrap of fabric found on the barbed wire fence came from appellant's shorts, that he had scratches on his wrists and leg, that his alibi was disproven by the testimony of his live-in girlfriend, and that there was eyewitness testimony that a man matching appellant's description was in the home. It is not our role to judge the credibility of the eyewitness testimony or to weigh the conflicting testimony when determining the sufficiency of the evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Finally, appellant argues that there was insufficient evidence to prove that he knowingly possessed the stolen weapons. However, there was ample evidence which, if believed, would support a conviction on this count. Adams testified that appellant brought him four guns, two to hold and two for sale. Once again, it is not our role to judge Adams' credibility for purposes of determining the sufficiency of the evidence. Id.
Accordingly, we find appellant's first assignment of error not well-taken.
In his second assignment of error, appellant contends that the trial court erred when it gave a complicity instruction to the jury on the Carrick burglary charge. Appellant argues that such an instruction was not warranted where there was no evidence that more than one person participated in the burglary. The trial court has the discretion to determine the final jury instructions to be given the jury and, therefore, its decision should not be overturned on appeal unless it constitutes an abuse of discretion. State v. Frost (1984), 14 Ohio App.3d 320, 322. An "abuse of discretion" requires a showing of more than an error of law or judgment; the court's decision must be unreasonable, arbitrary, or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151,157-158.
A complicity instruction is proper when the evidence presented at trial could reasonably be found to have proven the defendant guilty as an "aider and abettor." State v. Perryman
(1976), 49 Ohio St.2d 14, 358 N.E.2d 1040, at paragraph five of the syllabus, vacated in part on other grounds by Perryman v. Ohio
(1978), 438 U.S. 911. The prosecution need not prove the identity of the principal offender, only his existence, to justify the complicity jury instruction. R.C. 2923.03(C) and supra, at paragraph four of the syllabus.
In this case, appellant contends that the evidence presented suggested only that appellant was the principal offender. We disagree. From the evidence presented the factfinder could have concluded that Lugo and appellant were jointly engaged in a burglary spree. While there was evidence which placed appellant outside the Carrick home, the jury could also infer Lugo's participation from the evidence of his association with appellant during this period of time and the fact that Carrick saw a person dressed in shorts and a light-colored shirt outside her bedroom door but could not identify him at trial. Therefore, it would not have been unreasonable for the factfinder to have concluded that Lugo was in the house and that appellant was outside the home that night.
Appellant has failed to demonstrate that the trial court abused its discretion in giving the complicity instruction to the jury. Accordingly, appellant's second assignment of error is not well-taken.
In his third assignment of error, appellant argues that his convictions are contrary to the manifest weight of the evidence. Appellant alleges that there are serious credibility problems with Adams' testimony because it was tainted by the immunity bargain and with Carrick's testimony that the intruder was wearing blue jeans when the investigating officer's report does not include this fact. Furthermore, he argues that the conflicting scientific evidence weighed in his favor. Finally, he argues that the investigation was done in such a manner that exculpatory evidence was lost.
Since we have concluded that there was sufficient evidence to support submission of the case to the jury, we may next address the issue of whether the convictions were contrary to the manifest weight of the evidence. State v. Thompkins, supra. A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the conviction than not. Id. and State v. Smith, supra.
Upon a review of all of the evidence in this case as a whole, we find that the manifest weight of the evidence supports appellant's convictions. We cannot find any basis for concluding that the jury clearly lost its way or that a manifest miscarriage of justice occurred. A reasonable jury could have found in this case that Adams' testimony was believable even though he received something in exchange for it. The mere fact that he received immunity from prosecution does not automatically make his testimony incredible. As to Carrick's description of the intruder wearing jean shorts, her testimony was not contradicted by the investigator's report. She testified at trial that she told the officer the evening the crime occurred that the person wore jean shorts. The absence of this fact from the report does not automatically make her testimony unbelievable. The scientific evidence, while presenting opposing views, does not prevent the jury from accepting one expert's conclusions over another. Finally, while there is evidence that the police investigation may not have been as thorough as possible, there is no requirement that the police gather all the evidence that would exculpate the defendant. State v. Urrego (1974), 41 Ohio App.2d 124, 126.
Accordingly, we find appellant's third assignment of error not well-taken.
Having found that the trial court did not commit error prejudicial to appellant, the judgment of the Huron County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the court costs incurred on appeal.
JUDGMENT AFFIRMED.
Peter M. Handwork, P.J.
 Melvin L. Resnick, J.
 James R. Sherck, J.
CONCUR.